**Hans SCHENKEL**

v.

**H. R. LANDON, District Director, Immigration and Naturalization Service, United States Department of Justice, Boston, Massachusetts.**

Misc. Civ. No. 55-24.

United States District Court
D. Massachusetts.

June 14, 1955.

F. R. H. Witherby, Waltham, Mass., for plaintiff.

Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., for defendant.

WYZANSKI, District Judge.

The narrow question here presented is whether after Congress by the Act of June 19, 1951, c. 144, 65 Stat. 75 amended what had been called the Selective Service Act of 1948, 62 Stat. 604, and what was thereafter called the Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 451 et seq., the President retained his statutory power to prescribe regulations whereby a *resident* alien might apply for, and be allowed, relief from service in the armed forces.

The question arises here because an alien who, during his residence in the United States in 1954, secured relief from military service says he received this exemption without authority, and that since his relief was *de facto* and not *de jure*, he is not debarred from returning as an immigrant to the United States.

First, it is necessary to summarize the relevant parts of the immigration law. Section 212(a) (22) of the Immigration and Nationality Act of 1952 (hereafter called "the Act") 66 Stat. 184, 8 U.S.C.A. § 1182(a) (22) excludes from admission as immigrants to the United States aliens who are "ineligible to citizenship." This term is defined by § 101(a) (19), of the Act, 66 Stat. 169, 8 U.S.C.A. § 1101(a) (19) so as to include "an individual who is * * * permanently debarred from becoming a citizen of the United States under * * * any section" of the Act. Section 315 of the Act, 66 Stat. 242, 8 U.S.C.A. § 1426 provides that "(a) * * * any alien who applies * * * for exemption * * * from training or service in the Armed Forces * * * on the ground that he is an alien, and is * * * relieved or discharged from such training or service on such ground, shall be permanently ineligible to become a citizen of the United States. (b) The records of the Selective Service System or of the National Military Establishment shall be conclusive as to whether an alien was relieved or discharged from such liability for training or service because he was an alien." Thus the total effect of these statutory provisions is that an alien who on his own application is relieved from military service is thereafter inadmissible as an immigrant.

Second, it is appropriate to state the precise facts in this case. On August 15, 1953 Hans Schenkel, a Swiss citizen, having a quota immigrant visa, was admitted to the United States for permanent residence. He had already served in the Swiss army, and he came to perform in the United States electronic

work of importance for the national defense. Having been born February 18, 1929, he registered on February 3, 1954 under the Universal Military Training and Service Act. Local Board No. 16 in Arlington, Massachusetts on April 21, 1954 classified him in Class 1-A. He then relying upon the purported authority of Section 1622.42(c) of the Selective Service Regulations applied for exemption on the ground that he was covered by the treaty the United States had with Switzerland providing for exemption from military service of Swiss nationals. Schenkel was clearly warned that if the application were allowed he would be debarred from thereafter returning as an immigrant or becoming a citizen. May 19, 1954 the Local Board classified him in Class IV-C, as exempt from military service as a treaty alien.

On January 25, 1955 Schenkel, having first received a valid re-entry permit, went to Switzerland to see his recently widowed mother. February 25, 1955 he returned to the United States where his services were still needed in the electronic plant which he had left the month before. After a hearing, a special inquiry officer of the Immigration and Naturalization Service excluded Schenkel as an alien ineligible to citizenship under § 212(a) (22) of the Act. April 27, 1955 the Board of Immigration Appeals dismissed his appeal from the order of exclusion. May 17, 1955 Schenkel, who was then in custody of the District Director and was about to be deported, filed in this Court a petition for a writ of habeas corpus. The Court released Schenkel on bail.

The nub of Schenkel's contention is that within the meaning of the relevant provisions of the Immigration and Nationality Act he had neither applied for exemption from, nor been relieved from, military service, inasmuch as at the time of his application and of the Local Board's classification of him in Class IV-C the President had lost his statutory power to issue regulations relieving from military service aliens admitted for

*permanent* residence; and that, therefore, Schenkel was not ineligible for readmission.

This brings us finally to the words, context, and background of the Selective Service Acts, and more particularly to Section 1 of the Act of June 19, 1951, c. 144, 65 Stat. 75, 76, 83, 50 U.S.C.A.Appendix, §§ 454(a) and 456(a) whose construction is really in dispute.

Before that 1951 Act was passed, Congress by § 4(a) the Selective Service Act of 1948, 62 Stat. 604, 606 had given to the President in the following words the power to prescribe regulations for relieving from military service a citizen of a foreign country:

"Any citizen of a foreign country, who is not deferrable or exempt from training and service under the provisions of this title (other than this subsection), shall be relieved from liability for training and service under this title if, prior to his induction into the armed forces, he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President; but any person who makes such application shall thereafter be debarred from becoming a citizen of the United States."

Pursuant to the foregoing statutory power, September 27, 1951 the President prescribed § 1622.42(c) of Executive Order 10,292 [3 C.F.R.Supp.1951, 480, 493. See also Selective Service System Regulations Part 1622, § 1622.4(c), 32 C.F.R. Supp.1951, p. 819.] Thereby the President directed that in Class IV-C, a class relieved from military service, there

"shall be placed any registrant who is an alien and who is certified by the Department of State to be, or otherwise establishes that he is, exempt from military service under the terms of a treaty or international agreement between the United States and the country of which he is a national."

Against this background Congress enacted the disputed Act of June 19, 1951. Section 1(d) of this amendatory statute amends § 4(a) of the 1948 Act see 65 Stat. 76, 50 U.S.C.A.Appendix, § 454(a) in the following words:

"(d) Section 4(a) of such Act is amended to read as follows: '(a) Except as otherwise provided in this title, every male citizen of the United States and every male alien admitted for permanent residence, who is between the ages of 18 years and 6 months and 26 years, at the time fixed for his registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to section 3 of this title, or who is otherwise liable as provided in section 6(h) of this title, shall be liable for training and service in the Armed Forces of the United States: *Provided,* That each registrant shall be immediately liable for classification and examination, and shall, as soon as practicable following his registration, be so classified and examined, both physically and mentally, in order to determine his availability for induction for training and service in the Armed Forces: *Provided further,* That any male alien who is between the ages of 18 years and 6 months and 26 years, at the time fixed for registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to section 3 of this title, or who is otherwise liable as provided in section 6(h) of this title, who has remained in the United States in a status other than that of a permanent resident for a period exceeding one year (other than an alien exempted from registration under this title and regulations prescribed thereunder) shall be liable for training and service in the Armed Forces of the United States, except that any such alien shall be relieved from liability for training and service under this title if, prior to his induction into the Armed Forces he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President; but any alien who makes such application shall thereafter be debarred from becoming a citizen of the United States. The President is authorized, from time to time, whether or not a state of war exists, to select and induct into the Armed Forces of the United States for training and service in the manner provided in this title (including but not limited to selection and induction by age group or age groups) such number of persons as may be required to provide and maintain the strength of the Armed Forces.' "

■ If the foregoing section be read literally the first sentence of new § 4(a) imposes a duty to serve upon citizens and permanent resident aliens but does not reach other aliens; and the second proviso imposes a duty to serve only upon an alien who has remained in the United States in a status other than that of a permanent resident for a period exceeding one year and provides only for the relief of *such* alien upon compliance with Presidential regulations. If this literal construction is correct the consequence is not only that treaties of the United States are abrogated but that Presidential discretion in one of the most sensitive fields of foreign relations is sharply curtailed. Were such a result intended, one would expect first that it would have been adverted to in Congress; second, that the State Department would have been heard; and third, that immediately after the passage of the Act the President's Executive Order and the Selective Service regulations would have been modified and foreign embassies notified. None of these events appears to have occurred. It seems, therefore, that the word "such" which appears before the word alien in the clause "any such alien shall be relieved from liability for training and service under this title if, prior to his induction * * *" was intended

as a reference back to every alien covered anywhere in the whole of § 4(a). Admittedly this is a reading of the statute that would not appeal to a grammarian, but any other reading would do violence to reasonable Congressional, Presidential, administrative, and diplomatic expectation. Indeed the silence of Congress in the face of a well known history of four years of continued exemptions of resident treaty aliens argues almost conclusively that the literal interpretation is erroneous and that the word "such" must be read broadly as having many antecedents.

The petitioner in the case at bar also suggests that Congress withdrew the Presidential power to prescribe regulations exempting *resident* (as distinguished from non-resident) aliens by § 1(*l*) of the 1951 Act which amends § 6(a) of the 1948 Act, and which is printed at 65 Stat. 83, 50 U.S.C.A.Appendix, § 456(a). Therein it is provided that:

> "(a) Commissioned officers, warrant officers, pay clerks, enlisted men, and aviation cadets of the Regular Army, the Navy, the Air Force, the Marine Corps, the Coast Guard, the Coast and Geodetic Survey and the Public Health Service; cadets, United States Military Academy; midshipmen, United States Navy; cadets, United States Coast Guard Academy; midshipmen, Merchant Marine Reserve, United States Naval Reserves; students enrolled in an officer procurement program at military colleges the curriculum of which is approved by the Secretary of Defense; members of the reserve components of the Armed Forces, the Coast Guard, and the Public Health Service, while on active duty; and foreign diplomatic representatives, technical attachés of foreign embassies and legations, consuls general, consuls, vice consuls and other consular agents of foreign countries who are not citizens of the United States, and members of their

families, and persons in other categories to be specified by the President who are not citizens of the United States, shall not be required to be registered under section 3 and shall be relieved from liability for training and service under section 4, *except that aliens admitted for permanent residence in the United States shall not be so exempted.*" [Emphasis added.]

██ The answer to the contention based upon the foregoing new § 6 of the Universal Military Training and Service Act, 65 Stat. 83, 50 U.S.C.A.Appendix, § 456(a), is that there Congress was addressing itself to a class of persons, such as diplomats and persons already in the armed services, who were intended to be exempt *both* from registration and military service. The exception from that exemption states that resident aliens are not "*so* exempted", that is they do not get a double exemption. A resident alien must in every case register. He may indeed also have to serve; but this is an issue to be settled in accordance with regulations promulgated by the President under the grant of authority specified at page 76 of volume 65 of the Statutes at Large, 50 U.S.C.A.Appendix, § 454(a).

██ My conclusion that the President retained, even after the Act of June 19, 1951 his power to prescribe regulations exempting resident aliens and that, as a consequence, Schenkel, the petitioner here, was lawfully relieved of service and thereby became inadmissible as an immigrant when he sought to return to the United States, is admittedly contrary to the language in some of the reported cases, although not to the judgments entered in those cases.

United States v. Rumsa, 7 Cir., 212 F.2d 927 involved a Lithuanian immigrant who was in the United States as a resident alien. He registered under the Selective Service Act of 1948. He applied for and was granted by the Local Board a IV-C classification as an alien

exempt from military service under the terms of a treaty or international agreement between the United States and the country of which he is a national. The Court's opinion reports that in 1952, on the advice of the State Director of Selective Service, ·the Local Board changed Rumsa's classification to 1-A; but the opinion does not state what was the reason for that advice. When the Local Board ordered Rumsa to report for induction, he wilfully refused, and for that refusal he was indicted. At his trial he contended that as an alien he was not subject to military service; he did not contend and he could not properly have contended that he was a national of a country with which the United States had a relevant treaty. He was convicted and appealed. The Court of Appeals, in my opinion, quite correctly affirmed the conviction because the President had not authorized relief from military service of an alien just because he was an alien. But Swaim, C. J., 212 F.2d at page 932 used language which, to say the least, suggests that by its legislation in 1951 Congress intended to require military service of all resident aliens whether or not the alien was a national of a country with which we have a treaty. Neither the legislative history cited by that Court, nor the statutory language relied upon, nor the facts of the case before that Court imperatively demand such a broad conclusion. And, for reasons already stated, when stated with such amplitude the conclusion seems to me unsound.

United States v. Gredzens, D.C.D. Minn., 125 F.Supp. 867, involved a Latvian citizen who had immigrated to the United States as a resident alien. He had registered with the Local Board. That Board classified him as 1-A and ordered him to report for service. Without at any time applying to the Board for exemption from service on a claim of any treaty with Latvia, Gredzens failed to report. The grand jury indicted him for failure to report; and the Court, sitting without a jury, found him guilty.

There seems no doubt that the Court reached the correct result. Congress has provided that a resident male alien of a certain age must register with a local board, and has further provided that if the alien, on the ground of a treaty, seeks exemption from actual service, he must apply for it administratively. Section 1(d) of the Act of June 19, 1951, c. 144, 65 Stat. 75, 76, 50 U.S.C.A.Appendix, § 454(a) [Second Proviso.] Since Gredzens had not made application for exemption from service and since he had not been relieved from service, he was obligated to report for induction when ordered. The Court correctly ruled that his wilful defiance was a crime. However, unfortunately the District Judge used language, 125 F.Supp. at page 871, col. 3, headnote 3 which states that Congress had declared that an alien admitted for permanent residence was ineligible for exemption from military service. In my opinion, this is an unwarranted dictum.

United States ex rel. Rosio v. Shaughnessy, D.C.S.D.N.Y., 134 F.Supp. 217 involved a French national, resident in the United States, who in 1953 had applied for and been granted relief from military service and who went abroad. On his return as an immigrant to the United States he was excluded. He petitioned for a writ of habeas corpus. Judge McGohey, in my view, correctly denied the writ. But if his opinion implies that after 1951 treaty aliens admitted for permanent residence could not lawfully secure relief from military service, I respectfully disagree.

If I have misconstrued the Universal Military Training and Service Act, and the President in 1951 did lose his power to relieve from military service resident treaty aliens, I should nonetheless deny this writ of habeas corpus. For, in my view where an alien under color of law applied for relief from military service and was *de facto* granted that relief, he has become ineligible for re-admission to the United States as an immigrant. The object of Congress was

not to allow re-entry for permanent residence by any alien who set up and was granted a claim of exemption on the ground he was an alien.

It may be thought that it would have been more prudent for this Court to have rested its decision only on this latter ground. But it has seemed to me that though this course would have been easy it would have not been appropriate. The two reasons why this Court has initially addressed itself to the question of the authority of the local board to exempt are first, that it is the logical method, and second, that the three federal cases which have been cited have cast a cloud over the Presidential regulation which is said to have left perplexed those administering the universal military training and service system, local boards, diplomatic officials here and abroad, aliens here and others considering coming to the United States. These persons are entitled to know promptly whether the President retains power to exempt resident treaty aliens. It is, after all, not a minor source of local, national, and perhaps international irritation. And, since no constitutional issue is present, a court faced squarely with the problem of interpreting the 1951 Act ought not merely for its own ease of disposition to seek a side alley as an escape.

In disposing of this case on the questions raised, this Court is not unmindful of the broad problems of policy raised at the bar. It may be unwise to exclude this Swiss national who has already performed military service in his home country and who has rendered and wishes to continue rendering valuable and creative services in a plant supplying the United States with electronic equipment. Exclusion of Schenkel may harm American defense efforts and American relations with foreign countries. It may appear to penalize a national of a friendly state unless he is prepared to render double military duty. But if these results are unjust or otherwise undesirable, the remedy lies in the hands of those who vote at elections and in Congress, not in the courts of law.

The writ of habeas corpus is denied the petitioner's bail is revoked effective July 1, 1955, unless extended by order of the Court of Appeals, and the petitioner shall on that date return to the respondent's custody.